

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF L

2003 AUG 11 PM 12: 29

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| FREEPORT-MCMORAN SULPHUR LLC, Plaintiff | * | CIVIL ACTION NO. 03-1496 |
| VERSUS | * | SECTION: A |
| MIKE MULLEN ENERGY EQUIPMENT RESOURCE, INC. and OFFSHORE SPECIALTY FABRICATORS, INC., Defendants | * * | JUDGE: ZAINEY MAGISTRATE: ROBEY |

\* \* \* \* \* \* \* \*

### FREEPORT-MCMORAN SULPHUR LLC 'S
### FIRST AMENDING AND RESTATED COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, FREEPORT-MCMORAN SULPHUR LLC ("Freeport"), which amends and restates its original complaint in this case as follows:

### Parties

1.

The plaintiff, Freeport, is a Delaware limited liability company, with its principal place of business in New Orleans, Louisiana.

{L0021312.1}  1

2.

Made defendant herein is Mike Mullen Energy Equipment Resource, Inc. ("Mullen"), a Texas corporation, with its principal place of business in Dallas, Texas.

3.

Also made defendant herein is Offshore Specialty Fabricators, Inc. ("OSFI"), a Louisiana corporation with its principal place of business in Houma, Louisiana.

**Jurisdiction and Venue**

4.

This Court has jurisdiction over this matter under 28 U.S.C. § 1331 in that this is a suit relating to the purchase and sale of offshore oil and gas rigs and related equipment located on the Outer Continental Shelf in the Gulf of Mexico, which is governed by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1301 *et seq.*, and specifically 43 U.S.C. § 1349(b)(1).

5.

Venue is proper in this district under 43 U.S.C. § 1349(b)(1) because this is the "judicial district of the state nearest the place the cause of action arose." Venue is also appropriate in this judicial district because OSFI resides or may be found here.

**Factual Allegations**

6.

On June 13, 2001, Freeport and Mullen entered into a Purchase and Sale Agreement (the "2001 PSA") relating to the sale by Freeport to Mullen of certain rigs and related equipment located on Freeport's oil and gas platforms, works, structures and facilities located in Block 299, Main Pass Area, in the Gulf of Mexico (the "MPM

Facilities"). Particularly, the sale included (i) a certain rig and related equipment located on Freeport's Control Platform (the "Control Platform Rig") and (ii) a certain rig and related equipment located on Freeport's Main Pass 299 Production Platform No. 2 (the "Production Platform No. 2 Rig").

7.

With regard to Mullen's obligation to take delivery of the Control Platform Rig and Production Platform No. 2 Rig and related equipment, the 2001 PSA provides in pertinent part as follows:

> 2.  Removal of Assets. Buyer, at its sole cost and expense, shall be responsible for (a) severing the Rigs and each part of each thereof from each of the Control Platform and the Production Platform and dismantling and removing the Rigs from their current locations at the Control Platform and the Production Platform, and (b) repairing any damage and covering any openings resulting from such severance, dismantling and removal.

8.

By that certain Bill of Sale for Rig, also dated June 13, 2001, Freeport assigned the Control Platform Rig and Production Platform No. 2 Rig to Mullen. This assignment was made expressly subject to the terms and conditions of the 2001 PSA.

9.

On January 15, 2002, Freeport and Mullen entered into another Purchase and Sale Agreement (the "2002 PSA") relating to the sale by Freeport to Mullen of another rig and certain additional equipment located on the MPM Facilities. Particularly, the sale included (i) certain equipment located in Freeport's Power Plant (the "Power Plant Equipment") and (ii) a certain rig and related equipment located on Freeport's Main Pass 299 Production Platform No. 1 (the "Production Platform No. 1 Rig").

10.

With regard to Mullen's obligation to take delivery of the Power Plant Equipment and the Production Platform No. 1 Rig and related equipment, the 2002 PSA provides in pertinent part as follows:

> 2.  <u>Removal of Assets.</u>  Buyer, at its sole cost and expense, shall be responsible for (a) severing the Assets and each part of each thereof from each of the Power Plant and the Production Platform and dismantling and removing the Assets from their current locations at the Power Plant and the Production Platform, and (b) repairing any damage and covering any openings resulting from such severance, dismantling and removal.

11.

With regard to the timing of Mullen's removal obligations, the 2002 PSA further provides as follows:

> Buyer shall commence removal of the assets from the Power Plant and the Production Platform as soon as possible, but in no event later than February 28, 2002. Further, Buyer shall complete the removal of the Assets from the power plant and the Production Platform, and complete and/or comply with all of the above covenants set forth in this Section 2, on or before March 31, 2002; however, the March 31, 2002 completion deadline may be extended by a force majeure event in accordance with Section 9 hereof, with the duration of any such extension being equal to the duration of such force majeure event. Buyer understands, acknowledges and agrees that the foregoing time limitation on removal of the Assets and compliance with the other covenants in this Section 2 are important to Seller due to Seller's development needs for the MPM Facilities. Time is of the essence with respect to Buyer's obligations under this Section 2. Therefore, Buyer further acknowledges and agrees that if Buyer fails to comply with any of the foregoing requirements, Seller shall have the right to exercise any one or more of the following rights: (1) to collect from Buyer rent and/or storage fees at appropriate rates; (2) to collect from Buyer any extra expense incurred by Seller due to Seller's employees or contractors, or any subcontractors, having to work around the Assets and the performance of other projects; (3) to cause the Assets to be removed from the Power Plant and Production Platform, and to cause the other covenants set forth in this Section 2 to be satisfied, and Buyer shall reimburse Seller for any and all actual costs, expenses and overheads incurred by Seller in connection therewith; (4) to terminate this

Agreement and keep the Deposit (as hereinafter defined); or (5) to enforce or recover any and all remedies or damages allowed by law. Any amounts due to Seller under the foregoing shall be due and payable by Buyer to Seller on demand and shall be in addition to the Purchase Price (as hereinafter defined).

12.

By that certain Bill of Sale for Assets, also dated January 15, 2002, Freeport assigned to Mullen the Power Plant Equipment and Production Platform No. 1 Rig. This assignment was made expressly subject to the terms and conditions of the 2002 PSA.

13.

The assumption by Mullen of all responsibility for removing the above-described rigs and equipment from the MPM Facilities at Mullen's sole cost and expense was a principal cause for Freeport's entering into the PSAs with Mullen and the assumption by Mullen of these obligations constituted a significant portion, if not the major part, of the consideration for Freeport's agreement to assign these rigs and equipment to Mullen.

14.

Despite the above-cited contractual provisions, Mullen has to this date refused to take delivery of the Control Platform Rig, the Production Platform No. 1 Rig, and the Production Platform No. 2 Rig, by severing each from their associated platforms, structures and facilities, and by dismantling and removing these rigs from their locations on the MPM Facilities as required by the PSAs.

15.

Over the course of the last two years, Freeport has made numerous written demands upon Mullen to take delivery of these rigs by removing them from the MPM Facilities to no avail.

16.

As a result of Mullen's failure to take delivery of the subject rigs and equipment, Freeport has incurred (and is continuing to incur) damages which include, but are not limited to, unnecessary overhead expenses, inconvenience, interruption of business, and exposure to potential liability. Additionally, Freeport is prevented from the full use and enjoyment of the MPM Facilities and has been delayed and/or prevented from performing necessary modifications to the MPM Facilities.

17.

Mullen and OSFI purport to have entered into an agreement sometime subsequent to Mullen's execution of the 2002 PSA that provided for OSFI to remove only the Power Plant Equipment from the Power Plant Platform in exchange for $55,000 and an assignment by Mullen to OSFI of one piece of the Power Plant Equipment, a Marathon Diesel Generator.

18.

Sometime during January and February, 2003, at the request of Mullen and without the consent or advance knowledge of Freeport, OSFI removed the Power Plant Equipment from the MPM facilities and relocated same to its facilities in Houma, Louisiana, or other OSFI facilities. Upon learning that OSFI had removed the Power Plant Equipment from the MPM facilities, Freeport instructed OSFI to hold this equipment pending Mullen's removal of the remaining purchased assets from the Control Platform Rig, the Production Platform No. 1 Rig and the Production Platform No. 2 Rig and related equipment, and the payment by Mullen of the costs for removal and storage of these assets all as required by the terms and conditions of the PSAs.

19.

On May 27, 2003, Freeport filed its original complaint in this matter. Mullen and OSFI were sent courtesy copies of Freeport's original complaint on May 27, 2003 and were formally served on May 29, 2003.

20.

Thereafter, on or around May 28, 2003, Mullen demanded that OSFI turn over to Mullen one piece of the Power Plant Equipment, a Solar Centaur Gas Turbine Generator, claiming that Mullen had entered into an agreement to sell this generator to a third party by the name of Walters Power International.

21.

On or about June 2, 2003, OSFI informed Freeport of Mullen's demand for turnover of the Solar Centaur Gas Turbine Generator. By letter dated June 4, 2003, Freeport advised OSFI that, because Mullen had failed to perform all of its obligations under the PSAs regarding the removal of all purchased equipment and rigs from the MPM facilities, Mullen did not at that time have proper ownership of the Power Plant Equipment. Accordingly, Freeport asserted its ownership of the Power Plant Equipment in OSFI's possession (including the Solar Centaur Gas Turbine Generator) and instructed OSFI not to turn over any Power Plant Equipment to Mullen.

22.

On June 11, 2003, OSFI's counsel sent a letter to counsel for Mullen and Freeport acknowledging that Freeport's original complaint "unequivocally demonstrates that the title to the generator is in doubt." A copy of this letter is attached hereto as Exhibit "A." In its letter, OSFI further advises that because title to the Power Plant Equipment was

disputed, it had no alternative but to safeguard the equipment. The letter emphasized that OSFI would not turn the equipment over to either Freeport or Mullen until the dispute between Freeport and Mullen was resolved.

23.

Also, on June 11, 2003, OSFI filed a complaint in this Court bearing Civil Action No. 03-1664, a copy of OSFI's complaint is attached hereto as Exhibit "B." In OSFI's complaint, OSFI acknowledges that a title dispute exists between Freeport and OSFI regarding the Power Plant Equipment and seeks a declaratory judgment as to the true and rightful owner of the Power Plant Equipment then in the possession of OSFI. See Exhibit "B" at paragraph 12. Further, OSFI sought a declaration that OSFI is the owner of the Marathon Diesel Generator, which OSFI claims was assigned by Mullen to OSFI in exchange for removal and storage services rendered by OSFI to Mullen. See Exhibit "B" at paragraph 14.

24.

Upon information and belief, in addition to the Solar Centaur Gas Turbine Generator and the Marathon Diesel Generator, OSFI maintains custody and control over a third piece of Power Plant Equipment, a Waukesha 700 Horsepower Diesel Engine.

25.

On June 12, only one day after filing its complaint for declaratory judgment and advising that its only option was to safeguard the Power Plant Equipment in its possession, OSFI did an about-face and informed Freeport that it had decided to turn over certain of the Power Plant Equipment to Mullen despite Freeport's claims to ownership

and despite Freeports' demands that OSFI maintain possession of the subject equipment pending Mullen's satisfaction of all of Mullen's obligations under the PSAs.

26.

On or around June 13, 2003, OSFI did in fact deliver to Mullen, or to another party on Mullen's behalf, the Solar Centaur Gas Turbine Generator. Further, upon information and belief, OSFI has accepted a purported assignment from Mullen of the Marathon Diesel Generator, is wrongfully asserting ownership of same, and is exercising custody and control over same. Further, OSFI continues to maintain custody and control over the Waukesha 700 Horsepower Diesel Engine.

27.

On July 10, 2003, OSFI moved to dismiss its complaint under Civil Action No. 03-1664 after Mullen agreed to indemnify OSFI for its exposure to Freeport. This Court granted OSFI's motion, dismissing OSFI's complaint on July 11, 2003.

## Causes of Action Against Mullen

### Count I.  Declaratory Judgment Action

28.

Freeport seeks relief under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 in the form of a judgment declaring the rights and obligations of the parties hereto. Specifically, Freeport seeks a declaration that Mullen is in breach of its obligations under the PSAs and under Louisiana Civil Code Article 2549 to take delivery of the thing purchased by removing the rigs and related equipment from the MPM Facilities at its sole cost and expense.

29.

Further, Freeport seeks a declaration that Mullen is solely responsible for all costs, charges and amounts related to the storage, preservation and removal from the MPM Facilities of the assets described in the PSAs.

30.

In the alternative, Freeport seeks a declaration that Freeport is entitled to cause the subject rigs and equipment to be removed from the MPM Facilities and to cause the other covenants set forth in Section 2 of the PSAs to be satisfied, and that, in such event, Mullen shall reimburse Freeport for all costs, expenses and overhead charges incurred by Freeport in connection therewith.

31.

In the further alternative, Freeport seeks a declaration that Freeport is entitled to resell the subject rigs and equipment to a new purchaser and to retain all monies previously paid by Mullen.

32.

In the further alternative, Freeport seeks a declaration that Mullen did not at any time have proper title to or ownership of the Power Plant Equipment and, therefore, did not have the right or authority to possess, control, assign, transfer or otherwise direct the disposition of the Power Plant Equipment.

33.

In the further alternative, Freeport seeks a declaration that Freeport has retained title to and ownership of the Power Plant Equipment; that Freeport is entitled to be returned to possession of same; and that Freeport has the exclusive right and authority to possess, control, assign, transfer or otherwise direct the disposition of the Power Plant Equipment.

**Count II. Specific Performance**

34.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

35.

Freeport is entitled to specific performance of the PSAs. Specifically, Freeport seeks a judgment ordering Mullen to remove the subject rigs and equipment from the MPM Facilities at Mullen's sole cost and expense and in accordance with the conditions set forth in Section 2 of the PSAs.

36.

Further, Freeport seeks a judgment ordering that Mullen pay costs, charges and amounts related to the storage, preservation and removal from the MPM Facilities of the assets described in the PSAs.

37.

In the alternative, Freeport seeks a judgment ordering that, if Freeport causes the subject rigs and equipment to be removed from the MPM Facilities and to cause the other covenants set forth in Section 2 of the PSAs to be satisfied, Mullen shall reimburse Freeport for all costs, expenses and overhead charges incurred by Freeport in connection therewith.

38.

In the further alternative, Freeport seeks a judgment ordering that Mullen return any and all Power Plant Equipment in its possession, custody, or control to Freeport.

## Count III.  Breach of Contract

39.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

40.

Mullen's refusal to remove the rigs and equipment from the MPM Facilities at its sole cost and expense constitutes a breach of the express provisions of the PSAs.

41.

Further, Mullen's refusal to remove the rigs and equipment from the MPM Facilities constitutes a breach of Mullen's obligation to take delivery of the thing purchased as required by Louisiana Civil Code Article 2549.

42.

As a result of the above breaches, Mullen is liable to Freeport for all expenses and costs incurred by Freeport and preserving and storing the rigs and equipment, and for all other damages sustained by Freeport as a result of Mullen's breach.  Such damages include, but are not limited to, rental and/or storage fees at appropriate rates.

## Count IV.  Conversion

43.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

44.

Mullen's actions in directing OSFI to remove the Power Plant Equipment from Freeport's platforms without Freeport's consent, in taking possession of the Power Plant

Equipment and in selling, purporting to sell, or attempting to sell that Power Plant Equipment to OSFI and/or a third party constitute unlawful interference with Freeport's ownership and/or possession of the Power Plant Equipment and are in derogation of Freeport's possessory rights.

45.

Freeport owns and/or has the right to possess the Power Plant Equipment.

46.

As a result of Mullen's conversion of the Power Plant Equipment, Freeport is entitled to damages, including but not limited to, the fair market value of the subject equipment.

**Count V. Unjust Enrichment**

47.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

48.

Mullen's refusal to take delivery of and remove the rigs and equipment from Freeport's Main Pass facilities resulted from Mullen's desire to avoid incurring its own expenses for removing, transporting, storing and otherwise preserving the rigs and equipment (despite agreeing to do just that in the PSAs), and to thrust these costs upon Freeport. Indeed, Freeport did incur expenses and expended time and effort in storing, maintaining and preserving the rigs and equipment due to Mullen's failure to remove same. Further, Freeport continues to incur expenses in maintaining and preserving the rigs and equipment.

49.

To allow Mullen to use the MPM Facilities as a storage facility without compensation to Freeport would be inequitable; therefore, Mullen is responsible to Freeport under the theory of unjust enrichment, for the reasonable value of the use of Freeport's property occupied by the rigs and equipment and Freeport is entitled to reasonable rental and storage costs from the time that Mullens should have removed the rigs and equipment until such time as same are removed.

## Causes of Action Against OSFI

### Count I. Conversion

50.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

51.

OSFI's actions in removing the Power Plant Equipment from Freeport's platforms without Freeport's consent or advance knowledge; in taking possession of the Power Plant Equipment; in releasing that equipment to Mullen over Freeport's objection and claims of ownership; and in asserting ownership of that Power Plant Equipment constitute unlawful interference with Freeport's ownership and/or possession of the Power Plant Equipment and are in derogation of Freeport's possessory rights.

52.

Freeport owns and/or has the right to possess the Power Plant Equipment.

53.

As a result of OSFI's conversion of the Power Plant Equipment, Freeport is entitled to damages, including but not limited to the fair market value of the subject equipment from OSFI.

**Count II.  Declarations Regarding Power Plant Equipment**

54.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

55.

Pursuant to Louisiana Civil Code Article 2549, where, due to the Buyer's failure to take delivery, the Seller is forced to incur storage expenditures in order to preserve the thing sold, the Buyer is not entitled to delivery until it honors claims for those storage charges.  Therefore, Mullen is not entitled to take delivery of any Power Plant Equipment currently in OSFI's possession until Mullen pays all charges associated with the removal, storage and preservation of those assets described in the PSAs.

56.

Also pursuant to Louisiana Civil Code Article 2549, where the Buyer unreasonably refuses to take delivery of the thing, the Seller may resell it in order to mitigate its damages.  Therefore, Freeport has the right to sell the Power Plant Equipment in order to mitigate the damages it has and will suffer in connection with Mullen's refusal to remove those assets described in the PSAs at Mullen's sole cost and expense.  Freeport also has this right expressly under the 2002 PSA.

57.

Freeport seeks a declaration that OSFI does not now, nor did it at any time have the right or authority to control, assign, transfer or otherwise direct the disposition of the Power Plant Equipment.

58.

Further, Freeport seeks a declaration that OSFI does not now, nor did it at any time, have title to or ownership of any piece of Power Plant Equipment, and that any purported transfer of any piece of Power Plant Equipment from Mullen to OSFI is null and void and of no effect.

59.

Further, Freeport seeks a declaration that Freeport has retained title to and ownership of the Power Plant Equipment; that Freeport is entitled to be returned to possession of same; and that Freeport has the exclusive right and authority to possess, control, assign, transfer or otherwise direct the disposition of any piece of Power Plant Equipment.

60.

In the alternative, Freeport asserts that in holding the Power Plant Equipment, OSFI occupies the position of a depositary and Freeport occupies the position of a depositor under Article 3222 of the Louisiana Civil Code.

61.

Under Louisiana Civil Code Article 3222, Freeport therefore has a depositor's privilege on the Power Plant Equipment.

62.

In the further alternative, in the event that it is determined that Freeport does not hold a depositor's privilege on the Power Plant Equipment, Freeport has by operation of law rights to the possession of the Power Plant Equipment held by OSFI as a result of Mullen's breach of the PSAs. Specifically, Freeport has the right under Civil Code

Article 2549 to withhold delivery of the equipment from Mullen until Mullen honors claims for storage and other charges, as well as the right to resell this equipment to another purchaser.

63.

OSFI has the power to alienate, conceal, dispose of, or waste the Power Plant Equipment in its possession during the pendency of this litigation.

64.

To protect Freeport's privilege and/or other rights in and to the Power Plant Equipment, Freeport seeks and is entitled to a declaration under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 recognizing Freeport's privilege as to the Power Plant Equipment and/or declaring Freeport's right to exercise actual or constructive possession of and control over the Power Plant Equipment.

**Count III. Specific Performance**

65.

Freeport incorporates by reference the allegations contained in Paragraphs 6 through 27 hereof.

66.

In the further alternative, Freeport seeks a judgment ordering that OSFI return any piece of Power Plant Equipment in its possession, custody, or control to Freeport.

**WHEREFORE**, Freeport respectfully prays that this Court:

1)      Declare that Mullen is in breach of its obligations under the PSAs and under Louisiana Civil Code Article 2549 to take delivery of the thing purchased by

timely removing the rigs and related equipment from the MPM Facilities at its sole cost and expense.

2) Further declare that Mullen is solely responsible for all charges and amounts related to the storage, preservation and removal from the MPM Facilities of the assets described in the PSAs.

3) In the alternative, declare that Freeport is entitled to cause the subject rigs and equipment to be removed from the MPM Facilities and to cause the other covenants set forth in Section 2 of the PSAs to be satisfied, and that, in such event, Mullen shall reimburse Freeport for all costs, expenses and overhead charges incurred by Freeport in connection therewith.

4) In the further alternative, declare that Freeport is entitled to resell the subject rigs and equipment to a new purchaser and to retain all monies previously paid by Mullen.

5) In the further alternative, declare that Mullen and OSFI did not at any time have proper title to or ownership of any piece of Power Plant Equipment and, therefore, did not have the right or authority to possess, control, assign, transfer or otherwise direct the disposition of any piece of Power Plant Equipment.

6) In the further alternative, declare that Freeport has retained title to and ownership of the Power Plant Equipment; that Freeport is entitled to be returned to possession of same; and that Freeport has the exclusive right and authority to possess, control, assign, transfer or otherwise direct the disposition of any piece of Power Plant Equipment.

7) Ordering Mullen to remove the subject rigs and equipment from the MPM Facilities at Mullen's sole cost and expense and in accordance with the conditions set forth in Section 2 of the PSAs.

8) In the alternative, ordering that, if Freeport causes the subject rigs and equipment to be removed from the MPM Facilities and to cause the other covenants set forth in Section 2 of the PSAs to be satisfied, Mullen shall reimburse Freeport for all costs, expenses and overhead charges incurred by Freeport in connection therewith.

9) In the further alternative, ordering that Mullen and OSFI return any piece of Power Plant Equipment in their possession, custody, or control to Freeport.

10) Enter a judgment in favor of Freeport and against Mullen for all expenses and costs incurred by Freeport in preserving and storing the rigs and equipment, and for all other damages sustained by Freeport as a result of Mullen's breach of contract, plus interest, attorneys fees and all costs of this action.

11) Enter a judgment in favor of Freeport and against Mullen and OSFI for all other damages sustained by Freeport as a result of Mullen and OSFI's conversion of the Power Plant Equipment.

12) Enter a judgment in favor of Freeport and against Mullen for reasonable rental and storage costs from the time that Mullen should have removed the rigs and equipment until such time as same are removed.

13) Enter a judgment recognizing Freeport's privilege as to the Power Plant Equipment and/or declaring Freeport's right to exercise actual or constructive possession of and control over the Power Plant Equipment.

14) For all other just and equitable relief deemed appropriate.

Respectfully submitted,

CARL D. ROSENBLUM (No. 2083) T. A.
Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Fax: (504) 589-8296

and

_____
JEFFREY M. BAUDIER (No. 22250)
Jones, Walker, Waechter, Poitevent,
  Carrère & Denègre, L.L.P.
500 Dover Boulevard, Ste. 120
Lafayette, LA 70503
Telephone: (337) 406-5610
Fax: (337) 406-5620

Attorneys for Plaintiff,
Freeport-McMoRan Sulphur LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been forwarded to all counsel of record by placing same in the U.S. Mail, postage prepaid and properly addressed.

Lafayette, Louisiana this 7th day of August, 2003.

_____