UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 OCT 17 AM 8: 31

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| FREEPORT-McMORAN SULPHUR, LLC | CIVIL ACTION |
| VERSUS | NO. 03-1496 |
| MIKE MULLEN ENERGY EQUIPMENT RESOURCE, INC. AND OFFSHORE SPECIALTY FABRICATORS, INC. | JUDGE: A |
| | MAGISTRATE: 4 |

### ANSWER AND COUNTERCLAIM OF OFFSHORE SPECIALTY FABRICATORS, INC. TO PLAINTIFF FREEPORT-MCMORAN SULPHUR, LLC'S SECOND AMENDING AND SUPPLEMENTAL COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Defendant Offshore Specialty Fabricators, Inc. (hereinafter "OSFI"), and files its Answer and Counterclaim in response to the Second Amending and Supplemental Complaint of Plaintiff Freeport-McMoran Sulphur, LLC (hereinafter "FMS"):

I.

**FIRST DEFENSE**

Answering separately the allegations of FMS' Second Amending and Supplemental Complaint, OSFI avers as follows:

1.

OSFI admits the allegations contained in the first sentence of Paragraph 16(a) of FMS' Second Amending and Supplemental Complaint. OSFI denies that the complete text of Article 1 of the March 28, 2002 Turnkey Contract ("Turnkey Contract") is included in Paragraph 16(a) and refers the Court and the parties to the Turnkey Contract for the complete text of Article 1. OSFI denies all remaining allegations contained in Paragraph 16(a) of FMS' Second Amending and Supplemental Complaint.

100347.0001 WEST 5362768 v1

1

2.

OSFI admits that Article 7 of the Turnkey Contract is entitled "WORK SCHEDULE" but denies that the complete text of Article 7 of the Turnkey Contract is included in Paragraph 16(b). OSFI refers the Court and the parties to the Turnkey Contract for the complete text of Article 7. OSFI denies all remaining allegations contained in Paragraph 16(b) of FMS' Second Amending and Supplemental Complaint.

3.

OSFI admits that Article 2 of the Turnkey Contract is entitled "PERIOD OF CONTRACT." Otherwise, OSFI denies the allegations contained in Paragraph 16(c) of FMS' Second Amending and Supplemental Complaint and refers the Court and the parties to the Turnkey Contract for the complete text of Article 2.

4.

OSFI admits that Article 22 of the Turnkey Contract is entitled "DEFAULT AND TERMINATION" but denies that the complete text of Article 22 of the Turnkey Contract is included in Paragraph 16(d). OSFI refers the Court and the parties to the Turnkey Contract for the complete text of Article 22. OSFI denies all remaining allegations contained in Paragraph 16(d) of FMS' Second Amending and Supplemental Complaint.

5.

OSFI denies the allegations contained in Paragraph 16(e) of FMS' Second Amending and Supplemental Complaint.

6.

OSFI admits that it received $10,450,000.00 as partial payment for its Phase 1 work under the Turnkey Contract. Otherwise, the allegations contained in Paragraph 16(f) of FMS' Second Amending and Supplemental Complaint are denied.

7.

OSFI denies the allegations contained in Paragraph 16(g) of FMS' Second Amending and Supplemental Complaint.

8.

OSFI admits that on August 6, 2003, FMS sent a letter to OSFI in an apparent attempt to circumvent FMS' Phase 1 and Phase 2 obligations under the Turnkey Contract. Otherwise, the allegations contained in Paragraph 27(a) of FMS' Second Amending and Supplemental Complaint are denied.

9.

OSFI denies the allegations contained in the first sentence of Paragraph 27(b) of FMS' Second Amending and Supplemental Complaint. OSFI admits that it advised FMS by letter dated August 7, 2003 that OSFI disputed all allegations and statements made by FMS in its correspondence to OSFI dated August 6, 2003. Otherwise, the allegations contained in Paragraph 27(b) of FMS' Second Amending and Supplemental Complaint are denied.

10.

Paragraph 67 of FMS' Second Amending and Supplemental Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, OSFI denies the allegations contained in Paragraph 67.

11.

OSFI denies the allegations contained in Paragraph 68 of FMS' Second Amending and Supplemental Complaint.

12.

OSFI denies the allegations contained in Paragraph 69 of FMS' Second Amending and Supplemental Complaint.

13.

OSFI denies the allegations contained in Paragraph 70 of FMS' Second Amending and Supplemental Complaint.

14.

OSFI denies the allegations contained in Paragraph 71 of FMS' Second Amending and Supplemental Complaint.

15.

The prayer attached to FMS' Second Amending and Supplemental Complaint does not contain any averment to which a response is required. To the extent that a response is required to the prayer, OSFI denies each and every legal conclusion and factual allegation contained therein.

16.

All allegations not specifically admitted are denied.

17.

Except as stated here, OSFI incorporates by reference, as if fully restated herein, the entirety of OSFI's original answer and its answer to FMS' First Amending and Restated Complaint.

## SECOND DEFENSE

FMS' Second Amending and Supplemental Complaint fails to state a claim upon which relief can be granted, in whole or in part.

## THIRD DEFENSE

FMS has failed to mitigate its damages.

## FOURTH DEFENSE

FMS' claims against OSFI are barred because the relief sought by FMS in this suit is inconsistent with or contrary to the terms, conditions, and provisions of the March 28, 2002 Turnkey Contract and April 8, 2002 First Amendment to the Turnkey Contract.

## FIFTH DEFENSE

FMS' claims against OSFI are barred by the doctrine of unjust enrichment.

## SIXTH DEFENSE

FMS' claims against OSFI are barred by the doctrine of estoppel.

## SEVENTH DEFENSE

FMS' claims against OSFI are barred by the doctrine of waiver.

## EIGHTH DEFENSE

FMS' claims against OSFI are barred by the doctrine of force majeure.

## NINTH DEFENSE

FMS' claims against OSFI are barred by the doctrine of impossibility of performance.

## TENTH DEFENSE

FMS' claims against OSFI are barred because of unilateral mistake, in part, because FMS was unilaterally mistaken as to the commencement of the Phase 1 and Phase 2 activities, and the

scope of services to be performed by OSFI under the March 28, 2002 Turnkey Contract and April 8, 2002 First Amendment to the Turnkey Contract.

### ELEVENTH DEFENSE

FMS' claims against OSFI are barred by the equitable doctrines of unclean hands and *in pari delicto*.

### TWELFTH DEFENSE

FMS' alleged damages, if any, were caused by the actions or omissions of FMS and/or other individuals or entities for whom OSFI is not responsible.

### THIRTEENTH DEFENSE

FMS' claim for "all other damages" in Section 16 of its Prayer is barred by Section 17 of the March 28, 2002 Turnkey Contract, which expressly precludes the recovery of any consequential, indirect, or punitive damages of any kind or character.

### II.

### COUNTERCLAIMS

**AND NOW**, assuming the position of Counter-Claimant, OSFI asserts the following:

### PARTIES

1.

Defendant/Counter-Claimant OSFI is a Louisiana corporation with its principal place of business in Houma, Louisiana.

2.

On information and belief, Plaintiff/Counter-Defendant FMS is a Delaware limited liability company with its principal place of business in New Orleans, Louisiana. FMS has appeared in this action and service may be made on FMS by serving its attorney of record, Carl

D. Rosenblum, at Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P., 201 St. Charles Avenue, 49th Floor, New Orleans, Louisiana 70170.

## **JURISDICTION AND VENUE**

3.

This Court has jurisdiction over this action pursuant to 43 U.S.C. § 1333 *et seq.* because the Turnkey Contract related to services that occurred on the Outer Continental Shelf in offshore Louisiana. *See* 43 U.S.C. § 1349(b)(1).

4.

In addition, pursuant to Federal Rule of Civil Procedure 13(a), jurisdiction is proper in this Court as OSFI's counterclaims arise out of the same transaction or occurrence that is the subject matter of FMS' claims for relief in its Second Amending and Supplemental Complaint filed in this action.

5.

Venue is proper in this judicial district under 43 U.S.C. § 1349(b)(1) because the Eastern District of Louisiana is the judicial district of the State nearest the place where the causes of action arose.

6.

Venue also is proper in this judicial district under 43 U.S.C. § 1349(b)(1) because FMS resides or may be found there.

7.

Further, venue is proper in this judicial district because OSFI's counterclaims arise out of the same transaction or occurrence that is the subject matter of FMS' claims for relief in its

Second Amending and Supplemental Complaint, which FMS has elected to file in this judicial district.

## BACKGROUND FACTS

A. **The Turnkey Contract**

8.

On or about March 28, 2002, OSFI entered into a Turnkey Contract with FMS for the removal, site clearance, and scrapping of FMS' Sulphur and Salt Lease, OCS-G 9372, located in Main Pass Block 299 ("MP 299").

9.

OSFI agreed to perform the work under the Turnkey Contract in two phases. Phase 1 involved the removal of certain facilities located at MP 299, which are described in Exhibit A to the Turnkey Contract. Specifically, Phase 1 facilities included Bridge 1 though 9, BS-1, BS-3 through BS-6, Power Plant, Quarters, Sulphur Pipelines, and Electrical Cables, as described in Exhibit A of the Turnkey Contract.

10.

Phase 2 involved the removal of other production platforms and facilities described in Section 1 of the Turnkey Contract. Specifically, Phase 2 facilities included Production Platform No. 1, Production Platform No. 2, Bridge 10, Bridge 11, Bridge 12, Bridge 13, the BS-8 Facility, the BS-9 Facility, the Y-7 Facility, the BS-2 Facility, the Storage and Loading Facility, and the Control Platform.

11.

Under Paragraph 7 of the Turnkey Contract, OSFI agreed to perform under the following work schedule:

The Work schedule shall be set out by OSFI, provided that the Work must be commenced within 30 days following completion of reclamation of the Caminada Mine and approval by the MMS. Phase 1 must be completed as soon as practicable but not later than 12 months after final government permitting and/or delays from COMPANY [i.e., FMS] or COMPANY's subcontractors or any shorter time frame as may be practicable and stipulated by the MMS. CONTRACTOR [i.e., OSFI] will include in its Work schedule sufficient time for COMPANY to remove any materials for which COMPANY has the obligation to remove under this Contract. . . . . COMPANY will determine the timing and commencement of the removal of the Phase 2 Facilities, taking into account their potential for continued use.

12.

Paragraph 3 of the Turnkey Contract outlined the compensation for the MP 299 reclamation project:

> As full compensation for the performance of the Work and for COMPANY's share of those services to be provided under that Turnkey Contract, between COMPANY and CONTRACTOR, for the Removal, Site Clearance, and Scrapping of the Caminada Mine, CONTRACTOR shall be entitled to receive COMPANY's right, title, and interest in (i) the M/V E.W. Lutz; (ii) the leasehold rights for the Venice Base facility, located in Venice, Louisiana (the "Venice Base"), pursuant to that Agreement of Lease, dated April 20, 1990, between the Louisiana Fruit Company, as lessor, and Freeport-McMoRan Resource Partners, Limited Partnership, as lessee (the "Louisiana Fruit Lease") and certain equipment and other property located on the Louisiana Fruit Lease (the "Venice Base Assets"); and (iii) those living quarters, formerly located on the Sulphur Lease and now located in CONTRACTOR's yard in Houma, Louisiana (the "Louisiana Assets"). CONTRACTOR shall also be entitled to receive certain monies in the Main Pass Trust Account, as CONTRACTOR completes the reclamation and removal of individual facilities, as further provided in Paragraph 4.

**B.**   **Phase 1 of the Turnkey Contract**

13.

Paragraph 4 of the Turnkey Contract, entitled "PAYMENT AND TERMS," provided that OSFI would be entitled to other compensation for its Phase 1 reclamation services from the Main Pass Trust Account after completing certain percentages of its Phase 1 services.

14.

On or about August 8, 2002, OSFI and FMS entered into a First Amendment to Turnkey Contract. The First Amendment provided that the value of individual Phase 1 Facilities was $13,000,000. Accordingly, FMS was required to place $13,000,000 into the Main Pass Trust Account and pay this amount to OSFI as partial compensation for OSFI's Phase 1 services.

15.

On or about March 1, 2002, OSFI entered into an Assignment and Assumption Agreement with OSFI, whereby FMS conveyed its interest in the living quarters unit formerly located at Main Pass to OSFI. FMS provided this assignment as partial compensation for OSFI's Phase 1 services under the Turnkey Contract.

16.

On or about April 16, 2002, FMS executed a Bill of Sale for the transfer of the M/V E.W. Lutz to OSFI. The Bill of Sale provided that the vessel was sold free and clear of all liens, mortgages, and other encumbrances of any kind and nature, or any debts whatsoever, except as stated on the reverse of the Bill of Sale. No liens, mortgages, or encumbrances were stated on the reverse side of the Bill of Sale. FMS provided this assignment as partial compensation for OSFI's Phase 1 services under the Turnkey Contract.

17.

On or about May 8, 2002, David M. Hunter of Jones Walker sent the Certificate of Documentation, the Release of Mortgage, and the Bill of Sale of the M/V E.W. Lutz to Rob Cristoff of OSFI.

18.

On or about July 1, 2002, FMS entered into an Assignment, Assumption and Sublease Agreement with OSFI, whereby FMS transferred all of its right, title, and interest in and to the Louisiana Fruit Lease to OSFI. FMS provided this assignment as partial compensation for OSFI's Phase 1 services under the Turnkey Contract.

19.

On or about August 12, 2002, FMS assigned its rights to the Venice Base facility to OSFI with an agreement and acknowledgement of the assignment by Trinity Storage Services, L.P. FMS provided this assignment as partial compensation for OSFI's Phase 1 services under the Turnkey Contract.

20.

On or about August 12, 2002, the Minerals Management Service ("MMS") provided initial governmental permitting, and on or about August 20, 2002, the MMS provided final governmental permitting, for OSFI to begin its Phase 1 reclamation and abandonment services under the Turnkey Contract. Therefore, under Paragraph 7 of the Turnkey Contract, Phase 1 of the Turnkey Contract commenced on August 20, 2002. OSFI had until August 20, 2003 to complete its Phase 1 services, excluding any delays by FMS and force majeure.

21.

OSFI completed its Phase 1 work under the Turnkey Contract on July 20, 2003.

C. **Phase 2 of the Turnkey Contract**

22.

The Turnkey Contract provided two options for the Phase 2 Facilities. Under the first option, if FMS determined that it could not achieve any profitable uses for the Phase 2

infrastructure, then OSFI would remove the Phase 2 Facilities with no additional compensation beyond the compensation it received for the removal of the separate Phase 1 Facilities.

23.

The second option provided that OSFI and FMS would share equally in any profitable uses of the Phase 2 Facilities if these facilities had an alternative existing use, such as the storage and distribution of liquefied natural gas ("LNG").

24.

Specifically, Paragraph 4 of the Turnkey Contract provided that OSFI and FMS would share, on a 50/50 basis, any Contingent Payments, as described in Paragraph 4(iii) of the Turnkey Contract. The Contingent Payments, among other things, were to be placed in a Main Pass Trust Account under Paragraph 4(iii):

> CONTRACTOR's 50% share of any payments ("Contingent Payments,"), which COMPANY and CONTRACTOR obtain as net profits or net proceeds from Canadian or any other party, other than the amounts described in (ii) above. However, when CONTRACTOR completes all Phase 2 reclamation or when the monies in the Main Pass Trust Account are sufficient to fund the Phase 2 reclamation that CONTRACTOR has yet to conduct, then CONTRACTOR shall be entitled to receive its 50% share of the Contingent Payments described herein.

As outlined by Paragraph 4(iii) of the Turnkey Contract, OSFI and FMS agreed to equally share any net profits or net proceeds arising from the Phase 2 Facilities, including any alternative uses of Phase 2 Facilities for the storage and distribution of LNG.

25.

Because of the two possible options for the Phase 2 Facilities, the Turnkey Contract provided a "risk/reward" to OSFI. OSFI would take the "risk" that it may have to remove the Phase 2 Facilities at its own cost should the facilities be dismantled. On the other hand, should

FMS or OSFI find an alternative use and determine to leave the Phase 2 Facilities in place, OSFI would share in the "reward" of 50% of the proceeds from their continued use.

26.

Under the First Amendment to the Turnkey Contract, executed on or about August 8, 2002, OSFI and FMS agreed that the Contingent Payment for Phase 2 compensation would remain intact as provided by the Turnkey Contract.

27.

During the term of the Turnkey Contract, FMS provided to OSFI "alternative use updates" for the Phase 2 facilities. For example, on or about May 16, 2002 and June 11, 2002, FMS provided updates on the use of the existing Phase 2 infrastructure for the storage and distribution of LNG. FMS noted that it had contacted several companies, including El Paso Energy, Williams Energy, and Conoco, regarding alternative uses of these facilities.

28.

Upon information and belief, FMS has determined that the Phase 2 Facilities have potential profitable uses and has refused to allow OSFI to participate in any Contingent Payments resulting from the use of existing Phase 2 Facilities.

D.    **FMS' Attempt to Block OSFI's Recovery of Phase 1 and Phase 2 Proceeds**

29.

On or about August 6, 2003, David Landry of FMS sent a letter to Cesare Del Greco of OSFI, purportedly terminating the contract on the grounds that OSFI allegedly was in "material breach" of the contract. Specifically, FMS claimed that OSFI (1) failed to complete the Phase 1 reclamation within the time provided in the contract; and (2) improperly retained certain power plant equipment that FMS had designated for retention. As a result, FMS informed OSFI that it

relieved OSFI of its obligation to perform the Phase 2 work and requested a refund in the amount of $10,450,000.

30.

On or about August 7, 2003, OSFI formally denied the allegations contained in FMS' August 6, 2003 letter.

31.

On or about August 11, 2003, Roger Maduell of FMS confirmed in an e-mail to Brian Kern of OSFI and David Landry of FMS that OSFI completed its Phase 1 activities on July 20, 2003.

32.

On or about August 15, 2003, Roger Maduell of FMS stated that there was no need for OSFI's continued involvement with the removal, site clearance, and scrapping of MP 299. Mr. Maduell further stated that FMS would work with the MMS from that point forward.

33.

On or about August 27, 2003, OSFI sent a demand letter to FMS for the outstanding balance of $2,550,000.00 owed to OSFI for its Phase 1 work. FMS failed to respond to OSFI's August 27, 2003 letter.

## COUNT I
## DECLARATORY JUDGMENT

34.

OSFI repeats and realleges the allegations in Paragraphs 1 through 33 of its Counterclaim as though set forth in full.

35.

Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201-02, OSFI seeks a judgment from the Court declaring the rights and obligations of OSFI and FMS under the Turnkey Contract and First Amendment to the Turnkey Contract. Specifically, OSFI seeks a declaration that FMS does not have free and clear title to the Phase 2 Facilities described in the Turnkey Contract and does not have the right or authority to utilize, assign, transfer, or otherwise dispose of the Phase 2 facilities without providing OSFI with 50% of the net profits or net proceeds pursuant to the Turnkey Contract.

## COUNT II
## BREACH OF CONTRACT FOR PHASE 1

36.

OSFI repeats and realleges the allegations in Paragraphs 1 through 35 of its Counterclaim as though set forth in full.

37.

FMS' failure and refusal to pay to OSFI $2,550,000.00 for the Phase 1 work performed by OSFI constitute a breach of the express provisions of the Turnkey Contract and First Amendment to the Turnkey Contract.

38.

As a result of FMS' breach of contract, FMS is liable to OSFI in the amount of at least $2,550,000.00 for the Phase 1 work performed by OSFI.

39.

In addition, because FMS has defaulted upon and breached its contractual obligations under the Turnkey Contract and First Amendment to the Turnkey Contract, OSFI has been forced to retain attorneys to file suit to collect the amounts due by FMS. On or about August 27, 2003,

counsel for OSFI attempted to resolve the dispute in good faith by requesting that FMS pay $2,550,000.00 to OSFI for the Phase 1 work that OSFI performed. FMS failed to pay this amount to OSFI. Accordingly, pursuant to Paragraph 4 of the Turnkey Contract, OSFI also is entitled to interest, attorneys' fees, and expenses against FMS as a result of FMS' breach of contract.

### COUNT III
### BREACH OF CONTRACT FOR PHASE 2

40.

OSFI repeats and realleges the allegations in Paragraphs 1 through 39 of its Counterclaim as though set forth in full.

41.

As noted above, FMS has contacted several companies regarding the alternative uses of the Phase 2 facilities for the storage, transport, and disposal of LNG. Initially, FMS shared this information with OSFI pursuant to Phase 2 of the Turnkey Contract. However, upon information and belief, FMS has refused to disclose any additional LNG information to OSFI and has improperly attempted to invalidate the Turnkey Contract in an effort to retain all Phase 2 proceeds for its own benefit without sharing 50% of those proceeds with OSFI.

42.

FMS' failure and refusal to allow OSFI to continue its participation in the Phase 2 activities constitute a breach of the express provisions of the Turnkey Contract and First Amendment to the Turnkey Contract. Specifically, the Turnkey Contract provided that FMS and OSFI would share, on a 50/50 basis, any Contingent Payments that FMS and OSFI obtain as net profits or net proceeds from the Phase 2 Facilities.

43.

As a result of FMS' breach of contract, OSFI seeks a judgment that FMS must pay to OSFI 50% of the net proceeds or net profits resulting from any use, assignment, or other disposal of the Phase 2 Facilities pursuant to the Turnkey Contract and First Amendment to the Turnkey Contract.

## COUNT IV
## BREACH OF CONTRACT FOR LIEN UPON M/V E.W. LUTZ

44.

OSFI repeats and realleges the allegations in Paragraphs 1 through 43 of its Counterclaim as though set forth in full.

45.

As noted above, FMS executed a Bill of Sale on or about April 16, 2002, for the transfer of the M/V E.W. Lutz to OSFI. The Bill of Sale provided that the vessel was sold free and clear of all liens, mortgages, and other encumbrances of any kind and nature, or any debts whatsoever, except as stated on the reverse of the Bill of Sale. No liens, mortgages, or encumbrances were stated on the reverse side of the Bill of Sale.

46.

On or about March 5, 2002, Willie Womack filed with the United States Coast Guard a Notice of Claim of Lien, which stated that a lien had been established as of August 8, 1998 against the M/V E.W. Lutz in the amount of $800,000.00 for maintenance and cure.

47.

FMS failed to notify OSFI about the Womack lien and failed to remove this lien prior to, or any time after, the transfer of the M/V E.W. Lutz to OSFI. Such action and inaction constitute

a breach of the Turnkey Contract, the First Amendment to the Turnkey Contract, and the Bill of Sale.

48.

As a result of FMS' breach of contract, OSFI seeks a judgment that FMS must satisfy the $800,000.00 lien filed by Willie Womack and pay to OSFI all damages it has incurred as a result of the lien placed on the M/V E.W. Lutz.

## COUNT V
## UNJUST ENRICHMENT

49.

OSFI repeats and realleges the allegations in Paragraphs 1 through 48 of its Counterclaim as though set forth in full.

50.

As noted above, the Turnkey Contract provided a "risk/reward" to OSFI for the Phase 2 Facilities. OSFI would either remove the Phase 2 Facilities with no additional compensation should they prove to be unprofitable or receive 50% of the net proceeds or net profits should they have profitable alternative uses. FMS has determined that these facilities have potential profitable uses but has prevented OSFI from receiving its 50% share of the use or sale of the Phase 2 infrastructure.

51.

Allowing FMS to obtain 100% of the net profits or net proceeds from the Phase 2 Facilities would unjustly enrich FMS. Therefore, at a minimum, OSFI is entitled to the reasonable value of the use or sale of the Phase 2 Facilities.

**WHEREFORE**, Defendant and Counter-Claimant Offshore Specialty Fabricators, Inc. respectfully prays that its Answer to Plaintiff Freeport-McMoRan Sulphur, LLC's Second

Amending and Supplemental Complaint be deemed good and sufficient and after due proceedings be had, Judgment be entered dismissing Plaintiff Freeport-McMoRan Sulphur, LLC's Second Amending and Supplemental Complaint at Plaintiff's cost.

Further, Defendant and Counter-Claimant Offshore Specialty Fabricators, Inc. respectfully prays that its Counterclaims be deemed good and sufficient and that after due proceedings be had, that this Court:

1) Declare that FMS does not have free and clear title to the Phase 2 Facilities described in the Turnkey Contract and does not have the right or authority to utilize, assign, transfer, or otherwise dispose of the Phase 2 facilities without providing to OSFI 50% of the net profits or net proceeds pursuant to the Turnkey Contract and First Amendment to the Turnkey Contract;

2) Enter a judgment in favor of OSFI and against FMS, awarding $2,550,000.00 to OSFI, plus interest, attorneys' fees, and expenses, for FMS' failure to pay compensation to OSFI for the Phase 1 work it performed under the Turnkey Contract and First Amendment to the Turnkey Contract;

3) Enter a judgment in favor of OSFI and against FMS, ordering FMS to pay to OSFI 50% of the net proceeds or net profits resulting from any use, assignment, or other disposal of the Phase 2 Facilities pursuant to the Turnkey Contract and First Amendment to the Turnkey Contract;

4) Enter a judgment in favor of OSFI and against FMS, ordering FMS to satisfy the $800,000.00 lien filed by Willie Womack on the M/V E.W. Lutz and pay to OSFI all damages it has incurred as a result of the lien on the M/V E.W. Lutz;

5)   In the alternative, enter a judgment in favor of OSFI and against FMS that OSFI is entitled to the reasonable value of the use or sale of the Phase 2 Facilities; and

6)   Order all other just and equitable relief deemed appropriate to OSFI.

Respectfully submitted,

_____
CHARLES R. TALLEY, T.A. (#12634)
KENT B. RYAN (#18418)
BRADLEY SCHLOTTERER (#24211)
JAMIE A. DOMILISE (#28022)
**LEMLE & KELLEHER, L.L.P.**
601 Poydras Street, 21st Floor
New Orleans, Louisiana 70130-6097
Telephone:   (504) 586-1241
Facsimile:    (504) 584-9142
Attorneys for Offshore Specialty Fabricators, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record, by hand delivery, facsimile, or U. S. mail, postage prepaid and properly addressed, this ___ day of October, 2003.

_____